**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JORGE RUIZ,** | ) | **CASE NO.  1:09 CV 994** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| **OHIO DEPARTMENT OF** | ) | |
| **REHABILITATION AND** | ) | |
| **CORRECTIONS,** | ) | |
| | ) | |
| **Defendant.** | ) | <u>**MEMORANDUM OPINION**</u> |

This matter is before the Court on the Motion for Summary Judgment filed by Defendant,

Ohio Department of Rehabilitation and Corrections ("ODRC") (Docket #26).   Pursuant to Fed.

R. Civ. P. 56, ODRC seeks summary judgment as to all of the claims asserted by Plaintiff, Jorge

Ruiz.

**I.      Factual Background**

This case stems from the termination of Mr. Ruiz's employment by ODRC.

    **A.      Mr. Ruiz's Employment.**

Mr. Ruiz began his employment as a Corrections Officer with ODRC at the Grafton

Correctional Institution ("GCI") on September 8, 1997.  (Deposition of Jorge Ruiz at p. 8.)  For

several years after he was hired, Mr. Ruiz served as an instructor, and obtained certifications in

areas such as firearms; defense in blunt weapons; ground fighting; rape prevention; CPR; first

aid; and, blood-borne pathogens.  (Id. at p. 9.)  Mr. Ruiz testified that after a number of years he allowed his certifications to "drop" because he was "tired of dealing with the negative."  (Id. at p. 43.)  Mr. Ruiz testified he was tired of the negative attitude and gossip he perceived among the staff at GCI and had "stopped talking to people" at GCI except for two friends.  (Id. at p. 96.)  Mr. Ruiz testified that by December 2007 he "didn't want to deal" with staff members anymore. (Id. at p. 96.)

Mr. Ruiz also served on GCI's Strategic Response Team ('SRT") for six or seven years, but lost interest after his father died.  (Id. at p. 9.)

**B.     The Events of Sunday, December 30, 2007.**

On December 30, 2007, at approximately 11:11 a.m., it was discovered that an inmate at GCI, Elswick, committed suicide.  Elswick was an inmate in the Special Management Unit ("SMU").  The SMU is a segregation unit for inmates, providing isolation for inmates who exhibit behavior problems or those who must be segregated for their own safety.

During that time, Mr. Ruiz was working a 90-day schedule, and was assigned to serve as the "pod" officer in the SMU.  The pod officer is responsible for taking temperatures of the cells; making rounds to check on inmates; getting supplies; feeding the inmates; monitoring the porter's activities; and furnishing supplies or books.  (Id. at pp. 20-21.)  Because of security concerns, the pod officer was required to conduct rounds every 30 minutes in the SMU.  (Ruiz Depo. at pp. 93-94.)

The other officer assigned to the SMU on December 30, 2007 was Jeff Youngeberg.  Mr. Youngeberg was the "desk officer," sitting at the desk that serves as the sole entry and exit point for the SMU.  Mr. Youngeberg was responsible for monitoring every person entering and exiting the SMU; monitoring the SMU; and, managing the log-in book.  (Ruiz Depo. at p. 21.)  Capt.

-2-

Brian Puster was also on duty that day, and was the highest ranking officer at GCI that morning. (Ruiz Depo. at pp. 35-36.)  Capt. Puster stopped by the SMU that morning and talked with Officer Youngeberg, but he did not sign the desk log book as being present at that time.  (Puster Depo. at p. 6.)  The SMU was one of 31 posts that Capt. Puster was required to check during his shift.  (Id. at p. 15.)

There were 17 inmates in the SMU when Mr. Ruiz started his shift on Sunday, December 30, 2007.  (Ruiz Depo. at pp. 94-95.)  Being that it was a Sunday, there were fewer staff on duty. The post orders for the SMU on that day required the pod officer to check on every inmate in the cells each and every time he made rounds.  (Reynolds Depo. at p. 16.)  Mr. Ruiz testified that he believed the rounds he conducted to be sufficient, but admitted that he did not actually make visual contact with each of the inmates every 30 minutes as required.  (Ruiz Depo. at pp. 73 and 95.)  There are two floors in the SMU, an "upper" and "lower" range.  Mr. Ruiz testified during deposition that sometimes he would only check the upper or the lower range, and considered that to constitute a "round."  This was not in accordance with ODRC standards.  (Ruiz Depo. at p. 95.)

As stated above, at approximately 11:11 a.m. on December 30, 2007, it was discovered that Elswick had hanged himself in his cell.  Mr. Ruiz testified that he did not visually check on Elswick, who was on the "upper" range, for over two hours before his body was discovered. (Ruiz Depo. at p. 120.)  Elswick had been visited several hours prior to his suicide, for 34 seconds, by Psychology Assistant II Maija Mosley.

C.      **The Criminal Investigation.**

-3-

By policy, every inmate suicide is the subject of both criminal and administrative investigations. (Young. Depo. at p. 5.) GCI Investigator Eddie Young had primary responsibility for investigating potential criminal activity at GCI. In this case, the criminal investigation was conducted by Ohio State Trooper Weber, and Investigator Young acted as a liaison at GCI to assist the State Trooper with his investigation.

Mr. Ruiz was interviewed by State Trooper Weber on January 2, 2008. Mr. Ruiz was the only person interviewed by State Trooper Weber following the inmate suicide. Investigator Young served as a witness for the Miranda warnings given to Mr. Ruiz at the time of interview. (Ruiz Depo. at pp. 62-64.)

During his interview with State Trooper Weber, Mr. Ruiz admitted he did not follow ODRC and GCI procedures for making rounds in the SMU. (Ruiz Depo. at p. 68, Exhibit 5 at pp. 13-15.) Ruiz was required to contact each occupied cell every 30 minutes, making visual contact with the inmate, but in his signed witness statement admitted that he did not do so. (Id.) Mr. Ruiz falsely indicated in the log book that he made rounds every 30 minutes as required. (Id.)

The case was referred to local prosecutors and Mr. Ruiz was criminally charged with one county of Tampering with Records, in violation of Ohio Rev. Code § 2913.42, and one count of Dereliction of Duty, in violation of Ohio Rev. Code § 2921.44. (Ruiz Depo. at pp. 76-77, Exhibits 6 and 7.) As part of a Plea Agreement, the Tampering with Records charge was dismissed and Mr. Ruiz was convicted of a misdemeanor violation of the Dereliction of Duty charge. (Ruiz Depo. at pp. 78-79.)

**D.     The Administrative Investigation**

Warden Maggie Bradshaw assigned the GCI administrative investigation of the incident to Maj. Stephen Reynolds.  (Bradshaw Depo. at p. 14.)  As a Major at GCI, Maj. Reynolds is responsible for security of the institution, and directly supervises the captains and lieutenants.  (Reynolds Depo. at p. 7.)  Maj. Reynolds collected the videotape footage from cameras in the SMU; reviewed the log books; and, arranged for and conducted investigatory interviews with Mr. Ruiz; Officer Youngeberg; and, Capt. Puster.  (Reynolds Depo. at pp. 8-9.)

Upon reviewing camera footage from December 30, 2007, Maj. Reynolds observed Mr. Ruiz making rounds – sometimes only in the lower range and sometimes only in the upper range – in the SMU.  (Reynolds Depo. at p. 10.)  He observed a gap of approximately two hours prior to Elswick's suicide during which Mr. Ruiz had not conducted rounds on the upper range, where Elswick was located.  (Reynolds Depo. at p. 10.)  Further, Maj. Reynolds' investigation revealed that the notations made by Mr. Ruiz in the pod officer log book did not match the activity and time frames recorded by the video cameras in the SMU.

Maj. Reynolds testified during deposition that he did not consider the direct observation of only the upper or lower range in the SMU to be a proper "round" for purposes of GCI and ODRC rules, as explained in the post orders.  (Reynolds Depo. at p. 15.)  Maj. Reynolds testified that if an officer does not complete his rounds in a timely fashion, the reason should be noted in the log book.  (Reynolds Depo. at pp. 15-16.)

Maj. Reynolds reported his findings to the Warden in a written report.  (Reynolds Depo. at p. 11.)  The Warden was responsible for deciding whether to recommend discipline, based upon the factual findings of the investigation.  (Reynolds Depo. at p. 11.)

**E.      The Termination of Mr. Ruiz's Employment.**

-5-

On January 31, 2008, Mr. Ruiz had a Predisciplinary Conference at GCI.  (Ruiz Depo. at p. 50; Predisciplinary Conference Hearing Officer's Report, Exhibit 4 at p. 5.)  Mr. Ruiz was present at the hearing, along with Union representatives Bobbie Peters and Keith Holzhauer.  At this conference, evidence of Mr. Ruiz's alleged violations of ODRC Standards of Employee Conduct Rules 7, 22 and 38 were reviewed, which included the failure to follow post orders that required rounds be conducted every 30 minutes; falsifying log book entries; and, acts that threaten institutional security.  Mr. Ruiz was present and argued his rounds were proper; his log book entries were correct; mental health staff did not adequately assess the inmate who committed suicide; and, that the Critical Incident Support Team should have been activated to help Mr. Ruiz cope with the trauma of inmate suicide.  (Ruiz Depo. Exhibit 4 at p. 4.)  All of these arguments were included in the hearing officer's predisciplinary conference report.

On February 26, 2008, Mr. Ruiz was notified that his employment was terminated. (Deposition of Jorge Ruiz at p. 8.)  He received and signed a Notice of Removal from his position as a Corrections Officer.  The Notice stated that Mr. Ruiz was found to have violated three rules of the ODRC's Standards of Employee Conduct: (1) Rule 7 – Failure to follow post orders, administrative regulations, policies or directives; (2) Rule 22 – Falsifying, altering, or removing any document or record; and, (3) Rule 38 – Any act or omission not otherwise set forth herein which constitutes a threat to the security of the facility, staff, any individual under the supervision of the Department, or a member of the general public.  (Ruiz Depo. Exhibit 4 at p. 1; Bradshaw Depo. at pp. 22-27.)

ODRC's Standards of Employee Conduct contains a disciplinary "grid" that includes a

standardized list of rule violations and the appropriate discipline for those violations.  (Bradshaw Depo. at Exhibit A.)  The grid allows the Warden to determine the appropriate discipline for a particular offense, factoring in any prior discipline for violations of the ODRC Standards of Employee Conduct.  The Warden may consider circumstances which aggravate or mitigate the penalty. (Bradshaw Depo. Exhibit A at p. 6.)  The recommended discipline for a first-time violation of Rule 7 is a written reprimand or one-day suspension; for a first-time violation of Rule 22 is a written reprimand, one-day suspension, or removal from employment; and, for a first-time violation of Rule 38 is a two-day suspension or removal from employment.  In Warden Bradshaw's opinion, Mr. Ruiz's infractions were very serious and warranted removal. (Bradshaw Depo. at p. 27.)

### F.    Alleged Irregularities with the Investigation

In his Memorandum in Opposition, Mr. Ruiz alleges several irregularities during the investigation, including the following:

- Capt. Puster interviewed a witness, even though Capt. Puster was also disciplined;

- Ms. Mosley, the Psychology Assistant who visited Elswick briefly on the morning he committed suicide, was not questioned, investigated, or disciplined;

- Officer Youngeberg was not interviewed until 11 days after the suicide, and he was offered the support of the Critical Incident Stress Management Team (CIST);

- Capt. Puster was not interviewed until 17 days after the incident, and he was also offered the support of the CIST; and,

- Mr. Ruiz was interviewed by State Trooper Weber on January 2, 2008, and by Major Reynolds on January 3, 2008, but was not offered the support of the CIST team until 33 days later.

Mr. Ruiz asserts that while he was terminated as a result of the incident, none of the others involved, all Caucasian, were terminated.  Mr. Ruiz feels that he was subject to disparate

treatment because he his Hispanic.

G.      **Discipline of Captain Puster and Officer Youngeberg**

The investigation of the inmate suicide revealed disciplinary infractions by Captain Puster and Officer Youngeberg.  Captain Puster failed to sign in upon entry to the SMU and failed to sign the inmates' sign-in sheets.  (Puster Depo. at p. 8; Bradshaw Depo. at p. 19.)  He received a written reprimand and was docked two days' pay.  Officer Youngeberg failed to sign his post orders and failed to log-in Captain Puster in the log book.  Officer Youngeberg received a written reprimand.  (Youngeberg Depo. at p. 13; Bradshaw Depo. at p. 19.)

H.      **Arbitration**.

The Union filed a Grievance on Mr. Ruiz's behalf, challenging his termination.  (Arbitration Decision, Ruiz Depo. at Exhibit 10.)  A hearing was held on August 28, 2008.  ODRC called seven witnesses: (1) Major Stephen Reynolds; (2) Warden Maggie Bradshaw; (3) Labor Relations Officer Karen Maschmeier; (4) Captain Brian Puster; (5) Corrections Officer Jeff Youngeberg; (6) Captain James Hawkins; and, (7) Lieutenant Timothy Glowacki.  (Id. at p. 2.)  The Union called six witnesses on behalf of Mr. Ruiz: (1) Corrections Officer Brian Gribble; (2) Corrections Officer Ted Snyder; (3) Inmate Vance Edwards; (4) Lara Goldman, Psychology Assistant; (5) Corrections Officer Janice Rager; and, (6) Jorge Ruiz.  (Id.)

On October 14, 2008, the Arbitrator upheld Mr. Ruiz's termination.  (Id. at p. 11.)  The Arbitrator found as follows:

> The grievance is denied.  The Arbitrator has reviewed the Exhibits and Testimony and finds Management had just cause for removal.  The evidence is clear that when Warden Bradshaw became Warden at Grafton Correctional Institution, she took great pains to make the employees aware of a tightening of discipline.  The Union has made a valiant effort on the Grievants [sic] behalf.  However, the Union's claim that complacency by Management is the cause is not

-8-

supported by persuasive evidence. True there is testimony as to complacency and that "employees could be written up everyday". There is also evidence that Management took steps to correct this and employees were given plenty of notice.

The Unions [sic] argument that Inmates can commit suicide in thirty minutes has merit. It is also true that the Post Orders required rounds on a staggered basis every thirty minutes and on December 30, 2007, Grievant did not check on Inmate Elswick for two hours.

The Union argues that the rules on the log book entries were vague. However, the other witnesses seemed to have a clear understanding of how to put entries in a log book. The Union cites arbitrator David Pincus' decision in the Freda Cunningham Discharge Case. The Arbitrator has read this Decision. In the Cunningham case Arbitrator Pincus found intent based on the facts as does this Arbitrator. The discipline in Cunningham was modified because of procedural errors. In this case the Grievant admits to false entries in the log book. He also admits to not making rounds properly for ten years.

The Union attempted to show other officers did not make rounds in thirty minutes. However, the log books show reasons for this variance per Post Orders.

The Grievant claims he was under stress during the investigatory interview and wants to recant. Grievant had been a corrections officer for 10 1/2 years. He also had discipline on the absentee track. He knew, or should have known, how this all worked. The fact that he wasn't offered CIST is unfortunate, but this happened after the fact. The Arbitrator has reviewed The Seven Steps of Just Cause and finds the discipline appropriate.

**I.      Evidence of a Discriminatory Environment/Disparate Treatment**

Mr. Ruiz makes several allegations regarding discriminatory statements that were made

during his employment:

- Mr. Ruiz argues that over the years, many people told him he was an "instructor" at GCI only because he was Hispanic and "they needed to reach a quota for minority instructors." (Response Brief at p. 9.) Mr. Ruiz remembers Officer Hoover making this statement. (Id.);
- Mr. Ruiz states that he was asked "How many of your family members can fit in your car" by "so many people from the academy on down" and that this was "an everyday occurrence at [GCI]." (Response Brief at p. 9.) He specifically remembers Capt. Puster making this statement. (Id.)

- Mr. Ruiz asserts that someone stated, "Why aren't there any Puerto Ricans in the Star Wars movies? Because they're not going to work in the future

-9-

either." (Response Brief at p. 10.)

- Mr. Ruiz states that there have been so many comments regarding his national origin over the years that he cannot pinpoint just one.

In addition to the foregoing, Mr. Ruiz states that Warden Bradshaw testified that "every officer in the institution is responsible for inmate safety" (Bradshaw Depo. at p. 19); that Capt. Hawkins, an SMU supervisor, testified that in May 2009, two other corrections officers failed to make proper rounds but they were not terminated (Hawkins Depo. at pp. 11-12); that Officer Gribble, a Corrections Officer for 13 years, testified that rounds are not always made correctly, but that the failure to complete rounds correctly is not a frequent occurrence (Gribble Depo. at pp. 7-9); that Capt. Puster testified that an inmate suicide could "happen even when all the proper procedures are follows;" and, that Officer Gribble testified during deposition that the Corrections Officers "joke around" with one another, and that some of the jokes might be about one minority or another, including jokes about Hispanics (Gribble Depo. at pp. 11-12).

Finally, Mr. Ruiz cites the deposition testimony of Lieutenant Michael Wright, a long-term employee of GCI.  Mr. Wright testified that two officers were previously written up for not following post orders, but were not fired.  Mr. Wright believed Mr. Ruiz was overcharged for the infractions he committed and that he knew of other hangings at GCI but none that resulted in a termination.

## II.    The Complaint.

On April 29, 2009, Mr. Ruiz filed his Complaint with this Court.  (Docket #1.)  Mr. Ruiz alleges that the termination of his employment with GCI was the result of disparate treatment based on his national origin, Hispanic.  In Count One, Mr. Ruiz alleges he was terminated in

violation of Title VII of the Civil Rights Act of 1991, 42 U.S.C. § 2000e(k).  In Count Two, Mr. Ruiz alleges that he was wrongfully discharged, asserting that "Defendant failed to observe Mr. Ruiz's basic constitutional due process rights, did not observe its own regulations regarding the manner of disciplining and/or terminating an employee, and otherwise acted arbitrarily and capriciously in terminating Mr. Ruiz."

**III.     Defendant's Motion for Summary Judgment.**

On March 17, 2010, ODRC filed its Motion for Summary Judgment, seeking summary judgment as to all of the claims raised by Mr. Ruiz.  (Docket #26.)  ODRC argues that it is entitled to summary judgment on Mr. Ruiz's Title VII claim for national origin discrimination. ODRC asserts there is no direct or circumstantial evidence in this case to support the claim that Mr. Ruiz was disciplined differently because of his national origin.  ODRC states that Mr. Ruiz was terminated for violating ODRC rules.

ODRC argues that under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Mr. Ruiz cannot establish the fourth element of a *prima facie* case of discrimination, because he has not presented evidence that he was treated differently than others similarly situated.  Further, even if Mr. Ruiz could establish a prima facie case of discrimination, ODRC argues that he has failed to established that the legitimate, non-discriminatory reasons for terminating Mr. Ruiz were a pretext for discrimination.

Relative to Mr. Ruiz's due process claim, ODRC argues that Mr. Ruiz failed to allege and prove that the State law remedies available to him were Constitutionally inadequate.  ODRC points to the predisciplinary conference; the Arbitration conducted pursuant to the OCSEA Collective Bargaining Agreement; and, the fact that the Union provided a professional

representative and called six witnesses on Mr. Ruiz's behalf during the Arbitration.    Defendants argue that the binding Arbitration, conducted pursuant to the applicable Collective Bargaining Agreement, was sufficient to satisfy due process requirements.

Finally, Defendants assert that to the extent Mr. Ruiz raises a claim under Ohio law for wrongful termination, such claim is improper because the State of Ohio has not consented to this Court's jurisdiction.

On April 17, 2010, Mr. Ruiz filed his Memorandum in Opposition.  (Docket #28.)  Mr. Ruiz asserts that he was subject to disparate treatment because he is Hispanic.  Relying on the depositions of Officer Gribble and Lt. Wright, Mr. Ruiz argues that others who took shortcuts during their rounds, and those who were "written up" for not making proper rounds, were not terminated.  Mr. Ruiz states that Officer Gribble and Lt. Wright could not recall anyone else at GCI being terminated following an inmate suicide.  Mr. Ruiz argues that this establishes the fourth element for a prima facie case.

In addition to the foregoing, Mr. Ruiz argues that he has alleged facts sufficient to establish pretext.  Mr. Ruiz refers to the fact that he was the focus of the investigation following the suicide; his opinion that other GCI employees investigated "were treated very casually" while he was not; and, that the alleged irregularities in the investigation indicate that he was the target of the investigation from the beginning.

Finally, Mr. Ruiz asserts that others involved in similar incidents were not treated and disciplined in the same matter as Mr. Ruiz, and that he was subject to the alleged disparate treatment because he is Hispanic.  Mr. Ruiz states that GCI is a "racially charged and biased environment."  Mr. Ruiz states that he was always an exemplary employee; volunteered for

-12-

additional duties; was an instructor; received excellent performance reviews; in ten years was only written up for being late once or twice and, that in spite of his good record, he was terminated.  Mr. Ruiz argues that "the only possible reason for such harsh treatment is his national origin."

On April 27, 2010, ODRC filed its Reply Brief.  (Docket #30.)  ODRC states that, as the assigned "pod officer" in the SMU on the morning of December 30, 2007, Mr. Ruiz was required to conduct security rounds, but admittedly failed to do so, and admittedly created false log book entries indicating that he had completed rounds every 30 minutes as required.  ODRC argues that based on these infractions, it was within his employer's discretion to terminate his employment.

ODRC argues that Mr. Ruiz has not presented evidence that he was treated differently than similarly situated employees, as the employees referenced by Mr. Ruiz are not proper comparators.  ODRC states that Mr. Ruiz was terminated for violating three separate work rules, not simply because he failed to conduct proper rounds, and not simply because Inmate Elswick committed suicide.  ODRC asserts that Mr. Ruiz cannot establish a *prima facie* case of discrimination and cannot show that the reasons for his removal were a pretext for discrimination.        In addition to the foregoing, ODRC points to several factual assertions made by Mr. Ruiz which it asserts require correction:

- First, ODRC states that there is no evidence that Ms. Mosley, the Psychology Assistant II who checked on inmate Elswick on the morning of December 30, 2007, knew Elswick was suicidal; that Ms. Mosley was not on duty that day to conduct inmate interviews or conduct rounds, but was present to assist her husband, the prison chaplain, with programming and checked in on a few of the inmates.  (Mosley Depo. at pp. 16-20.)

- Second, ODRC states that both Capt. Puster and Corrections Officer Youngeberg were disciplined for failing to record Capt. Puster's visit to the SMU prior to the inmate's suicide.  Capt. Puster was the highest

ranking officer at GCI on the morning of December 30, 2007 and was responsible for supervising corrections officers at 31 different posts. (Puster Depo. at p. 15.)  Officer Youngeberg was the desk officer and was not responsible for conducting rounds.  The failure to record Capt. Puster's visit to the SMU that morning is not comparable to Mr. Ruiz's failure to conduct proper rounds and his falsification of log entries.  Capt. Puster and Officer Youngeberg had different responsibilities and engaged in different conduct than Mr. Ruiz and are in no way similarly situated to Mr. Ruiz.

•    Third, ODRC states that the decision to interview Mr. Ruiz as part of the criminal investigation was made by the State Trooper, not by anyone at GCI.  Therefore, any claims that the criminal investigation was unfair cannot be attributed to anyone at GCI.  Further, during the administrative investigation, Maj. Reynolds reviewed videotapes during which he noticed a gap of two hours between the rounds of the upper and lower areas of the SMU and, when compared with the log entries made by Mr. Ruiz, there were discrepancies.  Therefore, the investigation focused on Mr. Ruiz's conduct.  (Reynolds Depo. at pp. 10-11.)  The fact that other employees were interviewed at different times and were offered CIST support before Mr. Ruiz is immaterial.

•    Fourth, ODRC asserts that the allegedly discriminatory remarks cited by Mr. Ruiz in his response to Defendants' Interrogatories and deposition testimony cannot be attributed to any specific GCI employee and were not attributable to Maj. Reynolds or Warden Bradshaw who made the decision to terminate Ruiz's employment.

•    Fifth, ODRC argues that Mr. Ruiz was terminated for specific misconduct, and that the fact that other officers failed to conduct proper rounds on unspecified occasions does nothing to prove Mr. Ruiz's claims.  Further, ODRC cites the testimony of Officer Gribble and Lt. Wright, during which both testified that if they had observed an officer failing to conduct security rounds, they would be required to report the misconduct.  Officer Gribble testified that he had never reported another officer for failing to conduct security rounds. Lt. Wright testified that he could not identify a single incident of observing and disciplining a corrections officer for failing to conduct security rounds.

In summary, ODRC asserts that there is no dispute as to any material fact; that Mr. Ruiz failed to establish a prima facie case of disparate treatment; and, that he has failed to offer evidence of pretext.

-14-

IV.    **Summary Judgment Standard**

Summary judgment is appropriate when the court is satisfied "that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law."  FED. R. CIV. P. 56(c).  The burden of showing the absence of any such "genuine issue"

rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of
> informing the district court of the basis for its motion, and identifying those portions
> of 'the pleadings, depositions, answers to interrogatories, and admissions on file,
> together with affidavits, if any,' which it believes demonstrates the absence of a
> genuine issue of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)).  A fact is "material"

only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires

consideration of the applicable evidentiary standards.  The court will view the summary

judgment motion in the light most favorable to the party opposing the motion.  *Matsushita Elec.

Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of their case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "[t]he mere existence of

a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57

F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252).  Moreover, if the evidence

presented is "merely colorable" and not "significantly probative," the court may decide the legal

issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citations omitted).

-15-

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).  FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate.  *Id.*

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible.  The Sixth Circuit has concurred with the Ninth Circuit that "'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'"  *Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).  FED. R. CIV. P. 56(e) also has certain, more specific requirements:

> [Rule 56(e)] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify.  Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit.  Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.

*Wiley*, 20 F.3d at 225-26 (citations omitted).  However, evidence not meeting this standard may be considered by the district court unless the opposing party affirmatively raises the issue of the defect.

-16-

> If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.

*Id.* at 226 (citations omitted).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248.  The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249.  The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## V.    Discussion

The Court has thoroughly and exhaustively reviewed all of the claims raised by Mr. Ruiz in this action; ODRC's Motion for Summary Judgment; and, all supporting documentation, including a detailed analysis of the deposition testimony and evidentiary materials submitted by both Parties.  The Court has thoroughly restated the facts in this case.  Reviewing the summary judgment motion in the light most favorable to Mr. Ruiz, there are no genuine disputes as to any material facts in this case.  Mr. Ruiz has presented no evidence, either direct or circumstantial, that he was treated differently and/or terminated because he is Hispanic.

-17-

### A.    Disparate Treatment.

#### 1.    Prima Facie Case.

Title VII prohibits employers from discriminating against employees on the basis of race. 42 U.S.C. § 2000e.   Mr. Ruiz presented no direct evidence of discrimination in this case.  Where the plaintiff does not have direct evidence of discrimination, courts use a burden-shifting approach. The United States Supreme Court explained:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 804 (1973)).

"It is well established that the burden is on an employment discrimination plaintiff to establish a *prima facie* case of discrimination."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citations omitted).  To establish a prima facie case of race discrimination under *McDonnell Douglas* and *Burdine,* a plaintiff must prove that (1) he is a member of a protected class; (2) he was qualified for the job; (3) he experienced an adverse employment action; and, (4) he was treated differently than a similarly situated non-protected employee. *See Newman v. Federal Express Corp.,* 266 F.3d 401, 406 (6th Cir. 2001) (citing *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1246 (6th Cir. 1995)).

A plaintiff must show that employees who are alleged to be similarly situated are similarly situated in all respects. *Mitchell,* 964 F.2d at 583 (citing *Stotts v. Memphis Fire Dep't,*

-18-

858 F.2d 289 (6th Cir. 1988)).  That is, the similarly-situated individuals with whom the plaintiff

seeks to compare her treatment "must have dealt with the same supervisor, have been subject to

the same standards and have engaged in the same conduct without such differentiating or

mitigating circumstances that would distinguish their conduct or the employer's treatment of

them for it." *Id.*

The evidence in this case demonstrates that Mr. Ruiz was terminated because he violated

three rules of the ODRC's Standards of Employee Conduct: (1) Rule 7 – Failure to follow post

orders, administrative regulations, policies or directives; (2) Rule 22 – Falsifying, altering, or

removing any document or record; and, (3) Rule 38 – Any act or omission not otherwise set forth

herein which constitutes a threat to the security of the facility, staff, any individual under the

supervision of the Department, or a member of the general public.  (Ruiz Depo. Exhibit 4 at p. 1;

Bradshaw Depo. at pp. 22-27.)   Mr. Ruiz has presented no evidence that other, similarly

situated, non-Hispanic employees, received less severe discipline or were dealt with differently

for the same conduct.

The fact that Capt. Puster and Officer Youngeberg were disciplined less severely for

failing to properly document Capt. Puster's visit to the SMU on the morning in question is

irrelevant.  First, neither is "similarly situated," as each had different job duties on the day in

question.  Second, the infractions of Capt. Puster and Officer Youngeberg are different than those

committed by Mr. Ruiz.  Mr. Ruiz does not attempt to explain why either Capt. Puster and

Officer Youngeberg are "similarly situated" to him for purposes of his *prima facie* case.

The fact that other GCI employees had knowledge that security rounds were not always

completed as required, or other GCI employees could not recall another employee being

terminated after an inmate suicide is insufficient to establish that Mr. Ruiz was treated differently than similarly situated employees.  Mr. Ruiz provides no specific information from which the Court could determine the identity of any such employee; the specific job responsibilities of that employee; or, that an employee alleged to have violated ODRC rules who was not terminated was non-Hispanic.   Further, Mr. Ruiz was not terminated solely based on the fact that he failed to complete his rounds according to ODRC rules, nor was he terminated because inmate Elswick committed suicide.  Mr. Ruiz was terminated for specific violations of ODRC rules, violations that he admits.  Mr. Ruiz has not offered evidence that any, non-Hispanic officers were dealt with and disciplined differently for the same conduct.  Accordingly, Mr. Ruiz has failed to establish a prima facie case.

**2.      Pretext.**

In addition to the foregoing, had Mr. Ruiz satisfied his burden to present a *prima facie* case of discrimination, he has not established that the proffered reason for his termination is a pretext for discrimination.  "An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998).  "In order to prove pretext, therefore, the plaintiff must introduce admissible evidence to show that the proffered reason was not the true reason for the employment decision and that discriminatory animus was the true motivation driving the employer's determination." *Grace v. USCAR*, 521 F.3d 655, 677-78 (6th Cir. 2008).  "An employer may make employment decisions 'for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" *Brown v. Renter's Choice, Inc.*, 55

-20-

F. Supp. 2d 788, 795 (N.D. Ohio 1999) (quoting *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984)).  Mr. Ruiz has not satisfied his burden.

Defendant had a legitimate, non-discriminatory reason for terminating Mr. Ruiz's employment.  Mr. Ruiz admitted to the ODRC rule violations upon which his termination was based.  However, Mr. Ruiz argues that these reasons "must be seen as pretextual due to the racially charged and biased environment at GCI."  (Response Brief at p. 18.)  The evidence presented by Mr. Ruiz to support his claim of a "racially charged and biased environment" is simply insufficient and no jury could reasonably find otherwise.

Reliance by Mr. Ruiz on isolated discriminatory remarks and jokes alleged to have been made by other employees at GCI is misplaced.  "Unless the statements or conduct of nondecisionmakers can be imputed to the ultimate decisionmaker, such statements or conduct can not suffice to satisfy the plaintiff's burden of demonstrating animus." *Noble v. Brinker Int'l., Inc.,* 391 F.3d 715, 724 (6th Cir. 2004) (internal quotations, citation, and alterations omitted). Thus, "[i]n evaluating the relevancy of discriminatory remarks" as part of a pretext analysis, "this court examines the identity of the speaker," as well as "the substance of the remarks." *Hopkins v. Electronic Data Sys. Corp.,* 196 F.3d 655, 665 (6th Cir. 1999).  An isolated discriminatory remark made by one with no managerial authority over the challenged personnel decisions is not considered indicative of discrimination. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. Ohio 1998) (citing *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir. 1990)).

None of the alleged comments and jokes cited by Mr. Ruiz can be attributed to either Major Reynolds, who conducted the administrative investigation of Mr. Ruiz's conduct, or

Warden Bradshaw, who made the decision to terminate Mr. Ruiz's employment.[1]  Accordingly, they are irrelevant and do not serve to prove pretext in this case.

In addition, in his Response Brief, Mr. Ruiz states, "The only possible reason for such harsh treatment is his national origin, Hispanic, because in his tenure at GCI for more than ten years, no other officer has been treated so severely."  (Response Brief at p. 19.)   Mr. Ruiz has not presented evidence to substantiate his claims and "[m]ere personal beliefs, conjecture and speculation are insufficient to support an inference of . . . discrimination."  *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997).  Testimony from other employees with general, nonspecific knowledge that other employees failed to complete their required rounds without being terminated, or that other inmates committed suicide in the past without an employee being subsequently terminated, is insufficient to prove that a discriminatory animus was the true reason for Mr. Ruiz's termination.  Further, there is no evidence upon which a jury could reasonably conclude that the investigation of the events on the morning of December 30, 2007 in any way questionable.

Based on the foregoing, ODRC is entitled to summary judgment on Mr. Ruiz's Title VII claim.

**B.     Procedural Due Process.**

To establish a procedural due process claim pursuant to § 1983, a plaintiff must establish he has (1) a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution; (2) he was deprived of this protected interest within the meaning of the Due Process Clause; and, (3) that the State did not afford him

---

[1]Mr. Ruiz did not raise a hostile work environment claim in this case.

adequate procedural rights prior to depriving him of his protected interest. *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. Ohio 1999). The plaintiff must plead and prove that State remedies for redressing the wrong are inadequate. *Id.* (citing *Vicory v. Walton*, 721 F.2d 1062, 1066 (6th Cir. Ohio 1983)).

In this case, before his employment was terminated, Mr. Ruiz was afforded a predisciplinary conference.  After his termination, Mr. Ruiz was afforded a full hearing before a neutral arbitrator pursuant to the OCSEA Collective Bargaining Agreement.  Binding arbitration under a collective bargaining agreement satisfies the constitutional due process requirement. See *Collyer v. Darling*, 98 F.3d 211, 224 (6th Cir. 1996), *cert. denied*, 520 U.S. 1267, 117 S. Ct. 2439, 138 L. Ed. 2d 199 (1997).  There is no evidence whatsoever that these proceedings were inadequate or deficient.  Accordingly, Defendant is entitled to summary judgment on this claim as a matter of law.

### C.      Wrongful Discharge.

The Sixth Circuit has repeatedly and consistently held that the State of Ohio has not consented to be sued for State law claims in Federal court.  The State of Ohio has consented to be sued in only one forum – the Ohio Court of Claims. *See Leaman v. Ohio Dep't of Mental Retardation & Developmental Disabilities*, 825 F.2d 946, 954 (6th Cir. 1987) (en banc), *cert. denied*, 487 U.S. 1204, 108 S. Ct. 2844, 101 L. Ed. 2d 882 (1988); *State of Ohio v. Madeline Marie Nursing Homes*, 694 F.2d 449 (6th Cir. 1982). "[T]he fact that the state has waived immunity from suit in its own courts is not a waiver of Eleventh Amendment immunity in the federal courts." *Johns v. Supreme Court of Ohio*, 753 F.2d 524, 527 (6th Cir. 1985), *cert. denied*, 474 U.S. 824, 106 S. Ct. 79, 88 L. Ed. 2d 65 (1985), citing *Edelman v. Jordan*, 415 U.S. 651, 677 n.19, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974).

-23-

As discussed above, there is no evidence in this case that Mr. Ruiz was wrongfully discharged by ODRC.  However, because his State law claims are barred in this Court by sovereign immunity as embedded in the Eleventh Amendment, Mr. Ruiz's State law claim of wrongful discharge is dismissed without prejudice.

**V.      Conclusion**

Summary Judgment is hereby GRANTED as to Mr. Ruiz's Title VII and due process claims.  To the extent Mr. Ruiz raises a State claim for wrongful discharge, said claim is hereby DISMISSED WITHOUT PREJUDICE.  This case is hereby TERMINATED.

IT IS SO ORDERED.

            /s/*Donald C. Nugent*
           DONALD C. NUGENT
           United States District Judge

DATED:  May 27, 2010